Argued October 7; affirmed December 21, 1948

MATSUDA *v.* NOBLE ET AL., AND DeCOSTER

200 P. (2d) 962

*Paul F. Burris,* of Salem, argued the cause and filed a brief for appellant.

*E. L. Crawford,* of Salem, argued the cause and filed a brief for respondents C. D. and William K. Matsuda.

Before ROSSMAN, Chief Justice, and BELT, BAILEY and BRAND, Justices.

## BRAND, J.

The plaintiffs Matsuda were the owners of farm lands in Polk County, Oregon. The plaintiff, C. D. Matsuda, being a Japanese, was interned from June, 1942 until August, 1945. His son, the plaintiff William K. Matsuda, entered the military service of the United States in August, 1944. These circumstances made it necessary for the plaintiffs to make arrangements for the operation of their Polk County farm during their absence. The plaintiff C. D. Matsuda acted for and on behalf of both plaintiffs. On 31 January 1945, the plaintiffs, by C. D. Matsuda, executed and caused to be recorded in Polk County, Oregon, a power of attorney to William Noble. By this instrument, William Noble was authorized to operate the farm. It was further provided that, "My said attorney in fact shall have full power and authority in my name and on my behalf to dispose of all crops grown upon the above mentioned farm during the life of this power". Noble was further authorized to enter into any contracts which he should deem necessary in carrying out the powers given, which was also to be done "in my name and on my behalf".

On 9 February 1945, an agreement was executed between C. D. Matsuda, acting for both plaintiffs, and William Noble, which specified the duties of Noble under the power of attorney. The agreement provided for the compensation to be paid to Noble for his services. He was to have $200 per month out of the proceeds of the crops or livestock. All expenses were to be paid out of the proceeds from the farm, and it was further provided:

> "that all taxes including income taxes of the owner shall be paid; that the sum of $2510 shall be paid to the owner to cover his payment on his loan on the premises, his life insurance premium and that of his son William, and the school expenses of his children; and that after payment of the sums and expenses above referred to, the operator shall have as a bonus all the remaining proceeds of the crops or produce for the year 1945 from on said premises."

The provisions of the power of attorney and the agreement show that Noble was to operate the Polk County farm as agent for the plaintiffs.

The defendant DeCoster was a resident of Polk County, Oregon, but owned a farm in Marion County. On 28 February 1945, DeCoster leased his farm to William Noble and Margaret Noble, husband and wife. The lease was "subject, however, to the rights of S. S. Steiner, Inc., the purchaser and chattel mortgagee of the hop crop" growing upon the premises. The Nobles agreed to pay as rental one-fifth of all hops grown on the premises. The obligations of the lessee were fully set forth in the lease. Hops were grown upon both farms. S. S. Steiner, Inc., hereinafter called Steiner, made advances to finance both crops and thereafter purchased both.

The hops grown upon the Matsuda farm were delivered to Steiner between 29 September and 17 October 1945. Steiner had advanced to Noble for the Matsuda crop, $13,000. The crop brought $17,520.19. Steiner therefore became indebted to Noble as agent for plaintiffs in the sum of $4,520.19. Turning to the DeCoster ranch which was leased to Noble and wife, it appears that Steiner advanced $13,000 by check, payable to DeCoster and Noble, but this crop brought only $11,600.54. Upon this property Noble failed to realize by $1,399.46 the amount previously advanced by Steiner. This was the state of affairs when DeCoster brought an action at law against Noble and wife. The complaint was filed on 8 November 1945. It merely alleged "That said defendants are indebted to said plaintiff in the sum of Three Thousand Seven Hundred Nineteen and 57/100 ($3719.57) Dollars lawful money of the United States, for money had and received by said defendants for the use and benefit of plaintiff." The complaint further alleged that the indebtedness was unpaid and prayed for judgment. On 8 November 1945 DeCoster filed an affidavit for attachment wherein he stated that the defendants were indebted to the plaintiff in the sum of $3,719.57, "upon an express contract for the direct payment of money". On the same day a writ of attachment issued and a notice to garnishee was served on Steiner. On 9 November Steiner made a return wherein he acknowledged that he owed $4,532.24 to Noble. On 22 December 1945 Steiner filed an amended return in which he stated that his indebtedness to Noble was subject to a chattel mortgage held by the First National Bank of Independence, Oregon.

It will be recalled that Steiner owed Noble on the Matsuda hops $4,520.19. It was this indebtedness to

Noble which Steiner intended to return on the garnishment. Steiner's manager testified that in making the return a mistake of $12.05 occurred. The result of the error was a return of $4,532.24 instead of $4,520.19. This conclusively establishes that the return was made on the basis of the amount owing to Noble as agent for Matsuda. There is not a scintilla of evidence that Steiner owed any other money to Noble as agent or otherwise. Noble defaulted in the action by DeCoster, who on 11 May 1946 took judgment for the full sum of $3,719.57 with interest. It was further adjudged that execution issue against the money in the hands of the garnishee Steiner subject to the right of the First National Bank of Independence, Oregon. A writ of execution issued in the sum of $3,719.57 less the sum $774.97 which had been received in partial satisfaction on 13 May 1946. The return of the sheriff shows that he received from Steiner $2,944.60 which he credited upon the judgment. DeCoster received the money.

The theory of the DeCoster action against the Nobles was strange to say the least. He sued for $3,719.57 for money had and received. In order to support an attachment he stated under oath that the claim was based on an express contract for the direct payment of money. In the pending case, *Matsuda v. Noble et al.,* he testified that his claim embraced two items; one for $1,399.46, which is the amount in which the Steiner advances exceeded the proceeds from the sale of the hops on the DeCoster farm. Why the Nobles owed any such sum was not revealed. He testified in the pending case that the second item on account of which he claimed judgment for money had and received, was based on the failure of the Nobles to deliver to him one-fifth of the hops grown on the DeCoster farm. The

lease from DeCoster to Noble of 1 December 1945 provided that one-fifth of the hops should constitute the agreed rental. The failure of the Nobles to deliver one-fifth of the hops as rental could give rise at most to a claim for unliquidated damages, which is quite different from ''an express contract for the direct payment of money''. If, on the other hand, the Nobles had delivered one-fifth of the hops to DeCoster as rent, they would have reduced by that amount the hops which were sold to Steiner, leaving DeCoster with an increased obligation to Steiner on account of the fact that the advances exceeded the purchase price of the hops. As stated in appellant's brief, ''DeCoster was liable for any advances made by said corporation * * * and for which hops were not delivered in repayment''.

It is apparent that DeCoster, as a witness in the pending case, correctly stated the items which went to make up his alleged claim of $3,719.57 against the Nobles. $1,399.46 is in fact the amount in which Steiner's advances exceeded the proceeds from the sale of the hops on the DeCoster farm. $11,600.54 is the amount which Steiner owed as the purchase price for the hops sold from the DeCoster ranch. One-fifth of that sum is $2,320.11. The sum of the two items, $1,399.46 plus $2,230.11 equals $3,719.57 which was the amount sued for in the case of DeCoster against the Nobles.

In view of the nature of the alleged claims, it is difficult for us to find a sound basis for the judgment which DeCoster obtained or for the attachment which was issued. Of course, neither the right to recover judgment, nor the right to levy attachment was ever considered on its merits by the circuit court, since the judgment was taken by default.

At the trial of the case of *Matsuda v. Noble et al.,* on 15 January 1947, the complete record to date in the case of DeCoster against the Nobles was introduced in evidence. The exhibit included the record from complaint to the final order after judgment, wherein the treasurer was directed to pay to DeCoster the money received from Steiner. An agreement of — December 1945 between DeCoster and the Nobles was also received in evidence. That agreement also appears as an exhibit attached to the reply of the plaintiffs Matsuda to the answer of the defendant DeCoster. That agreement, which was made several months before DeCoster took judgment against the Nobles, provided in part as follows:

"That in consideration of said parties of the second part's not taking bankruptcy, and in further consideration of said parties of the second part's turning over to party of the first part said warehouse receipt for said 15 bales of hops referred to above, it is agreed that said party of the first part will ultimately dismiss the action which he has brought against said parties of the second part for failure to comply with the terms of said lease and will take no judgment against said parties of the second part in connection therewith; but it is further understood and agreed that said party of the first part may have the privilege of attempting to enforce his claim against said parties of the second part in so far as it is a claim against certain moneys now held under attachment in said action commenced by said party of the first part against parties of the second part. That party of the first part may pursue said fund to final determination and disposition thereof and may have any amounts from said fund which said party of the first part is able to have the Court decree belongs to or should be apportioned to the claim of said party of the first part against said parties of the second part

referred to above. That said right to attempt to enforce said claim against said fund is one of the considerations for this agreement, but that when said party of the first part has fully exhausted his remedies in connection with said matter, whether he receives anything or does not receive anything, he shall thereupon give to parties of the second part a full and complete release from all liability in connection with said lease and the growing of said crop of hops; and in the meantime shall not attempt to enforce any claim against said parties of the second part growing out of said operation, except as herein defined.''

Notwithstanding the agreement, DeCoster took judgment against the Nobles on 11 May 1946, as heretofore stated. The parties to this appeal stipulated to complete the record in the case of DeCoster versus the Nobles in the Supreme Court. Based upon the record now before us, it appears that upon being advised of the existence of the agreement of — December 1945, the circuit court vacated the judgment for the plaintiff in the case of DeCoster versus the Nobles, and the Nobles were permitted to file, and have filed an answer in which they allege that all claims existing in favor of the plaintiff DeCoster against the defendants Noble have been compromised, settled and discharged. The DeCoster case appears now to be pending upon the motion of the plaintiff DeCoster to set aside the order vacating the judgment. Thus it appears that DeCoster has actually received $2,945.26 from Steiner as upon execution issued after judgment, although the judgment is no longer in effect. The last mentioned sum was determined as follows; the default judgment was for $3,719.57. The writ of execution issued for that sum less the sum of $774.97, ''partial satisfaction May 13, 1946''. The return of the sheriff

shows that he received from Steiner $2,944.60 plus 66 cents costs, making a total of $2,945.26.

After this outline of the facts, the issues made by the pleadings in the Matsuda case will become clear. On 15 December 1945, and subsequent to the suit by DeCoster against the Nobles, but prior to the judgment in that suit, the plaintiffs brought a suit in equity against the Nobles, Steiner, and DeCoster, as defendants. A. L. Thomas intervened, (Ivy B. Thomas, Administratrix, substituted). In their complaint the plaintiffs sought an accounting from Noble and judgment against him for $3,404.56, and that a constructive trust be impressed upon the funds in the custody of the defendant Steiner. Plaintiffs also prayed that the claims of DeCoster and Margaret Noble be held inferior to the claim of the plaintiffs in and to the fund held by defendant Steiner and that the plaintiffs also have judgment against William Noble in the sum of $2,500.00. The answer of the defendant Steiner set up his contract with William Noble and acknowledged an indebtedness due Noble in the sum of $4,532.24. Steiner also set up the fact of DeCoster's suit against Noble in the sum of $3,719.57 and the garnishment served upon Steiner and the return made thereon. Steiner prayed leave to pay the sum of $4,532.24 into court and to be relieved from further liability. A. L. Thomas intervened with a prayer that Noble be required to account to the plaintiffs and that he have judgment against the plaintiffs. There is no issue before us as to his claim.

DeCoster filed an answer to the plaintiffs' complaint on 30 November 1946, which was subsequent in time to the default judgment which he had secured against the Nobles. He set up his action at law against the Nobles, the garnishment of Steiner, the judgment

in his favor against the Nobles, and the issuance of execution and a recovery in the sum of $2,945.26 in full satisfaction. He further alleged that Noble had produced crops on the plaintiffs' lands, acting in his own name, of which the plaintiffs had knowledge; that the plaintiffs represented that Noble had an interest in the crop and the right to bind the plaintiffs in all matters concerning the marketing thereof; that the plaintiffs and Noble had knowledge of the action of DeCoster against the Nobles and that they failed to appear in such action and should now be estopped and barred from claiming any right in or to the money realized by DeCoster upon the execution; that Noble was the "agent, attorney and partner of plaintiff". DeCoster further alleged that on the 28th day of February, 1945, he leased his hop farm to the Nobles and agreed that he would advance to them such money as they required for growing and harvesting the crops and that the rental should be one-fifth of all hops produced and harvested on the premises. He further alleged that the lease was upon the following terms:

"That upon failure of defendants Noble to produce sufficient hops to repay advances made for the growing and harvesting of said hops, they would immediately repay any balance to lessee and/or his broker".

DeCoster alleged that he advanced $13,000 to Noble; that Noble spent not to exceed $10,000 of the advancements for the purposes specified and failed to pay the rental as agreed or to repay the advances as agreed, excepting only the sum of $12,374.85.

DeCoster, as a witness, testified that Noble operated the farm for him on a lease basis and that the agreement was shown by a written lease and that there

were no other transactions except transactions growing out of this lease. The lease from DeCoster to the Nobles is in evidence and we are unable to find any provision in it whereby as alleged, the Nobles were immediately to repay any balance if the hops grown were insufficient to repay advances.

On 7 April 1947 the trial court entered a decree adjudicating the rights of all parties to the suit. Judgment was entered upon the Thomas claim against the plaintiffs. The plaintiffs received judgment against the defendants Noble in the sum of $2,455.75. It was decreed that DeCoster pay to the clerk of the court within fifteen days the sum of $2,945.26, and that if he failed to do so the plaintiffs have judgment against him in that amount. It will be recalled that in addition to the $2,944.60 which DeCoster received from Steiner on the execution, the defendant Steiner paid the balance due Noble to the treasurer of Marion County to abide the decision of the court in this case. The final decree directed that that sum should be applied to the indebtedness owed by the plaintiffs on the Thomas claim. DeCoster failed within fifteen days to comply with the order of the court and on 2 June 1947 judgment was entered against him in the sum of $2,945.26. The only appeal from the decree of the trial court is by DeCoster and that appeal is taken only to the portion of the decree requiring DeCoster to pay within fifteen days the sum of $2,945.26, and providing that upon payment of said sum by DeCoster the same be applied, first, to the amount decreed owing to the intervenor Thomas, second to the payment of the judgment against defendant Noble, and that the remainder of said sum be paid to the plaintiffs. Except for the issue presented by DeCoster in his notice of appeal, the rights

of all parties have been conclusively determined by the portions of the decree from which no appeal has been taken. The remaining question is whether the plaintiffs are entitled, as against DeCoster, to the money which DeCoster received on the execution in his case against the Nobles.

■ DeCoster's first proposition of law is that the Matsuda suit constitutes a collateral attack on the judgment in the case of DeCoster versus Noble and wife, and second, he contends that the matter in controversy is res judicata by reason of the DeCoster-Noble judgment. Since the parties have presented to the court the record which shows that the judgment in the DeCoster-Noble action has been vacated, there is no longer any basis for the contention that this suit is a collateral attack or that the issues were res judicata.

As we see it, the decisive question in the case may be stated thus: When DeCoster sued the Nobles and served garnishment on Steiner, did he become entitled to receive money owed by Steiner to Noble as agent of the plaintiffs Matsuda?

■ The general rule in the United States is that:

"Garnishment proceedings will reach such moneys, credits, or other property as actually belong to defendant, and only such property. They will not reach property which in equity and good conscience should be treated as the property of some one other than defendant, and where defendant's title to property is so defective that he could not retain it as against a third person such property cannot be considered as belonging to him for the purpose of garnishment. * * *" 38 C. J. S., Garnishment, § 71, p. 267.

As illustrative of the foregoing principle, it is said that property held in trust by a defendant is not subject

to garnishment for debts owed by him as an individual. The same rule is generally applied as to debts owing to the defendant as trustee. 38 C. J. S., Garnishment, § 81, p. 285. It is also generally held that a garnisher does not stand in the position of a purchaser in good faith and for value, but is in no better position than a purchaser or an assignee with notice. 38 C. J. S., Garnishment, § 183, p. 407. If this were still the law of Oregon, the garnishment would have no effect at all as against the funds held by Steiner, which, though owed to Noble as agent, should in equity and good conscience be treated as property of the plaintiffs.

In Oregon, the common law as cited above has been changed by statute.

> "From the date of the attachment, until it be discharged or the writ executed, the plaintiff, as against third persons, shall be deemed a purchaser in good faith and for a valuable consideration of the property, real or personal, attached, subject to the conditions prescribed in the next section as to real property. * * * " O. C. L. A., Provisional Remedies—Attachment, § 7-207, Vol. 1, p. 633.

If this statute had been construed to mean what it apparently says, the result would be that a plaintiff serving notice to garnishee on a debtor of defendant could apply to the payment of defendant's debt to plaintiff, property which in equity belonged to a total stranger, and since plaintiff would "be deemed a purchaser in good faith and for a valuable consideration" he could do this, though in fact he knew that the garnishee owed the defendant only as trustee for, or, as agent of another and though he relied upon nothing but his own ingenuity. The Oregon courts early construed the statute so as to avoid most of the possible injustices which would have followed from a literal

construction thereof. In the case of *Riddle v. Miller,* 19 Or. 468, 23 P. 807, involving an attachment of real estate, it was recognized that by the law of Oregon prior to the adoption of certain statutes, a creditor could only acquire by virtue of a levy or of the docketing of a judgment, a lien upon the actual interest which the debtor had in the property at the time the attachment or execution was issued or the judgment docketed. The court then said:

" * * * The statute has materially enlarged the creditor's right under the proceedings, in the manner indicated; but the legislature did not intend thereby to give to a creditor, by virtue of such levy or the docketing of a judgment, any right as against an outstanding equity known to him at the time his lien attached. Acts of that character have always been construed as giving to a creditor, under such circumstances, such rights only as he would acquire under a voluntary sale of the property to him by the debtor for a valuable consideration. They operate to cut off the equities of third persons in the property, where the proceeding under them is taken and perfected without any knowledge of such equities. In the latter case, the equities between the parties being equal, the law prevails; but where a creditor resorts to such a proceeding who is informed of the outstanding equity, or of facts sufficient to put him on an inquiry by which he could ascertain the existence of such equity, the lien he secures thereby will be subject to it."

In *Jennings v. Lentz,* 50 Or. 483, 93 P. 327, 29 L. R. A., N. S. 584, the court said:

" * * * Under the law as it existed prior to the adoption of the statute mentioned, to the effect that after the filing of the attachment proceedings the creditor shall be deemed a purchaser in good faith, the creditor, by virtue of his attachment, acquired a lien only on the actual interest which

the debtor had in the property: Riddle v. Miller, 19 Or. 468 (23 Pac. 807). It is obvious that the statute on this point was intended to modify this rule, and to give the attaching creditor, regardless of the actual condition of the debtor's title, additional protection by placing him in the same position as a bona fide purchaser for value, in case of failure on the part of the real owner to observe the requirements of the recording acts. But, in construing these acts, it has been repeatedly held, and has become a settled rule in this State, that an attaching creditor, although placed on an equality with a purchaser by this statute, cannot insist on any greater protection than would be granted to such purchaser; and, in suits in equity, the claim of a bona fide purchaser for value is an affirmative defense, which must be pleaded, thereby placing the burden of proof in such cases upon the party relying thereon;" (citing cases).

In *Barnes v. Spencer,* 79 Or. 205, 153 P. 47, the court referred to the provisions of O. C. L. A., § 7-207 and said:

" * * * In order for defendant Spencer, as an attaching creditor, to be deemed a purchaser in good faith and for a valuable consideration as against the plaintiff, Grace D. Barnes, who is the owner of an outstanding equity in the property upon which execution was levied, the defendant must allege and prove all the facts necessary to establish that character of his ownership as against such equity. * * *"

To the same effect we quote from the opinion of *Metropolitan Investment & Improvement Co. v. Schouweiler,* 83 Or. 695, 163 P. 599, 164 P. 370.

"This court has been called upon several times to interpret Section 301, L. O. L., [now O. C. L. A., § 7-207] in its application to this state of facts. It is well settled that the legislature did not intend to put the attaching creditor in any better position

than the holder of a subsequent deed from the defendant in the attachment action. It is accordingly held that it is necessary for the attaching creditor to allege and prove that he had no notice of the unrecorded deed when his attachment was levied: Rhodes v. McGarry, 19 Or. 222, 228–231 (23 Pac. 971); Flegal v. Koss, 47 Or. 366, 371 (83 Pac. 847)."

In discussing the rights of an attaching creditor of land against the holder of an unrecorded deed, this court said:

"The burden was upon the defendants in this case to affirmatively allege and prove every step necessary to entitle them to the rights of a purchaser in good faith for a valuable consideration. No presumption of regularity can relieve them of this burden; * * *" Bailey v. Hickey, 99 Or. 251, 195 P. 372.

■ Many of the cases on this point relate to the question of priority between attaching creditors and the holders of unrecorded deeds to real property, but the same reasons expressed in the cited cases apply with equal or greater force when a plaintiff serves notice to garnishee upon a debtor of a defendant. Garnishment creates no lien on any money in the hands of the garnishee. *Murphy v. Bjelik,* 87 Or. 329, 169 P. 520, 170 P. 723.

*Wheeler Lumber, Bridge & Supply Co. v. Shelton,* 146 Or. 550, 29 P. (2d) 1013, 31 P. (2d) 163, was a replevin action against the sheriff. The plaintiff claimed to be the owner of certain lumber which had been attached in an action brought by Thomas against Etzel in which Thomas had caused the lumber in Etzel's possession to be attached. Here, as in the cases involving land, the court held that before an attaching

creditor can be deemed a purchaser in good faith he must allege and prove the facts establishing his position as such. In the last cited case, the court quoted from *Rhodes v. McGarry* with approval. The question in the latter case was whether an attachment of land could prevail over an outstanding equity. The attaching creditors sued the holder of the legal title and attached the land. They relied upon the provisions of O. C. L. A., § 7-207. Speaking of the attaching creditors, the court said:

> "* * * It can hardly be supposed that the legislature intended, by the provision of the Code referred to, to place an attaching creditor upon any more favorable grounds, with reference to his rights in the property attached, than those occupied by a purchaser of the property; nor to deem the former a purchaser in good faith except under the same circumstances in which the latter would be deemed such a purchaser. Any other view would lead to absurd consequences and occasion injustice. It would enable a party to cut off an outstanding equity by resorting to an attachment when he would not be able to accomplish it by a direct purchase of the property. * * *" *Rhodes v. McGarry et al.,* 19 Or. 222.

It was held that the attaching creditors could prevail only if they showed valid attachment proceedings and that they had no notice or knowledge of the equity of the plaintiff.

We conclude that it is the established law of this state that an attaching claimant takes subject to any adverse claims of which he has knowledge or sufficient notice to put him on inquiry, notwithstanding the provisions of O. C. L. A., § 7-207. *Saling v. First National Bank of Tillamook,* 93 Or. 237, 182 P. 140. It is equally well established that the burden is upon the attaching creditor to bring himself within the terms

of the statute by alleging and proving that he had no notice or knowledge of the outstanding equity at the time of the attachment and that if the attaching creditor was informed of facts sufficient to put him on inquiry, by which inquiry he could have learned the truth, his attachment would be subject to the outstanding equity. *First National Bank of North Bend v. Gage,* 71 Or. 373, 142 P. 539.

■ DeCoster, on whom the burden rested, has failed either to plead or to prove want of notice of the plaintiffs' interest in the money owing by Steiner as the purchase price of the Matsuda hops. In point of fact, we think DeCoster must have known that the only money owed by Steiner was on account of the sale of the Matsuda hops since his own operation resulted in a´ net loss. We hold that the claim of DeCoster is inferior to the right of the plaintiffs in the money garnished in the hands of Steiner.

■ The defendant DeCoster asserts that by reason of the failure of the plaintiffs to appear in the action of DeCoster against the Nobles the plaintiffs should be estopped from claiming any interest in the attached money. DeCoster's complaint merely alleged that the Nobles were liable for money had and received. O. C. L. A., § 1-316, provides that "at any time before trial any person who has an interest in the matter in litigation may, by leave of court, intervene in the suit, action or proceeding". The "matter in litigation" is shown by the pleadings. The plaintiffs did not have any interest, much less a direct and immediate interest, in the "matter in litigation". The statute imposed no duty on the plaintiffs to intervene. 39 Am. Jur., Parties, § 56, p. 930. *Chase National Bank of Ohio v. City of Norwalk,* 291 U. S. 431, 78 L. ed. 894.

■ The statutory provision relative to adverse claims to property attached is to be found, not in O. C. L. A., § 1-316, but in O. C. L. A., § 7-213, which is to be constructed in pari materia with O. C. L. A., § 6-1402. *Vulcan Iron Works v. Edwards,* 27 Or. 563, 36 P. 22, 39 P. 403. The sections to which we have referred are as follows:

> "Adverse claims to attached property. If any personal property attached be claimed by a third person as his property, the sheriff may summon a jury to try the validity of such claim, or at the option of the adverse claimant the court out of which the attachment issued shall try the adverse claim in a summary manner, and the same proceedings shall be had thereon with the like effect as in case of seizure upon execution." O. C. L. A., § 7-213.

> "Notice of adverse claim: Mode of trial. When personal property shall be seized by virtue of any execution, and any person other than the defendant shall claim such property, or any part thereof, and shall give notice thereof in writing, the sheriff may summon from his county six persons, qualified as jurors between the parties, to try the validity of the claim, giving five days' notice of the time and place of the trial to the plaintiff in the execution or his attorney; or the adverse claimant may, at his option, have his claim adjudicated in a summary manner in the court out of which the execution issued, by affidavit, by oral testimony in open court or otherwise, as the court may determine." O. C. L. A., § 6-1402.

In the case of *Francisco v. Stringfield et al.,* 166 Or. 683, 114 P. (2d) 1026, the two statutes were considered and it was held that when an adverse claim to attached property was made and the right thereto was determined, either by a sheriff's jury or by the court in a summary manner, the decision constituted a complete indemnity to the sheriff but did not prevent the adverse

claimant from bringing an independent action for the recovery of the possession of the attached property.

In *Tallman v. Havill,* 133 Or. 407, 291 P. 387, the plaintiff Tallman as owner brought an action against Havill for conversion of oats. The defendant Havill had sued one Peterson. Peterson defaulted and judgment was taken against him. A writ of execution issued against the oats which were in the possession of Peterson. Tallman notified all parties of his claim of ownership but failed to deposit with the sheriff the cost of the sheriff's jury. As a result, the matter was not tried before the sheriff's jury and the oats were sold by the sheriff. The defendant Havill contended that the plaintiff had conceded that his claim was unfounded by failing to carry on the proceedings before the sheriff's jury. The court said:

> "* * * It has become well established in this state that the sole purpose of the above proceeding is to provide the sheriff with a method whereby he may avoid the danger of trespassing on the property of those who are not parties to the case; therefore, if the verdict is against the claimant, he can not afterwards maintain an action against the sheriff: Remdall v. Swackhamer, 8 Or. 502; Capital Lmbr. Co. v. Hall, 9 Or. 93; Hexter v. Schneider, 14 Or. 187 (12 P. 668) ; Vulcan Iron Works v. Edwards, 27 Or. [563], 571 (36 P. 22, 39 P. 403). But the proceeding, not being judicial in nature, 23 C. J., Executions, § 508, p. 586; Capital Lmbr. Co. v. Hall, supra, does not conclude the right of the claimant against any one but the sheriff: Hexter v. Schneider, supra; Coos Bay RR. Co. v. Wieder, 26 Or. [453], 456 (38 P. 338). It necessarily follows that where no determination is had by the sheriff's jury, even though the failure was due to the refusal of the claimant to deposit the necessary fee, he has not precluded himself from prosecuting his claim against any one except possible the sheriff."

We hold that the plaintiffs were under no obligation to pursue the remedy provided by O. C. L. A., § 7-213, (assuming that that section is applicable in a case of a garnishment of a chose in action). The plaintiffs promptly availed themselves of their right to bring an independent suit to establish their interest in the funds which were in the hands of the defendant Steiner and which funds are now in the hands of the defendant DeCoster. We find no merit in the claim that the plaintiffs are barred by an estoppel. 5 Am. Jur., Attachment and Garnishment, § 971, p. 182.

The judgment of the circuit court is affirmed.